UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC H.,[1]

      Plaintiff,                        Case No. 2:22-cv-12510

                                           Magistrate Judge Kimberly G. Altman

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## OPINION AND ORDER ON
## CROSS MOTIONS FOR SUMMARY JUDGMENT

I.      Introduction

This is a social security case.  Plaintiff Eric H. brings this action under 42

U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of

Social Security (Commissioner) denying his applications for Disability Insurance

Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security

Act (the Act).  Both parties have filed summary judgment motions, (ECF Nos. 12,

16).  The parties have consented to the undersigned's jurisdiction including entry

---

[1] Consistent with guidance regarding privacy concerns in Social Security cases by the Judicial Conference Committee on Court Administration and Case Management, this district has adopted a policy to identify plaintiffs by only their first names and last initials.  *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

of a final judgment under 28 U.S.C. § 636(c).  (ECF No. 11).

For the reasons set forth below, Plaintiff's motion, (ECF No. 12), will be DENIED; the Commissioner's motion, (ECF No. 16), will be GRANTED; and the decision of the administrative law judge (ALJ) will be AFFIRMED.

## II.     Background

### A.     Procedural History

Plaintiff was 40 years old at the time of his alleged onset date of October 10, 2018.  (ECF No. 8, PageID.91, 102).  Plaintiff has past relevant work as a carpenter, painter, pipe fitter, and truck driver and crane operator.  (*Id.*, PageID.99-100, 110-111).  He alleges disability due to full titanium knee replacement, degenerative disc disease, C5 bone to bone, asthma, and hypertension.  (*Id.*, PageID.91, 102).

On May 3, 2019, Plaintiff filed applications for DIB and SSI.  (*Id.*, PageID.91, 102).  His applications were initially denied on August 7, 2019.  (*Id.*, PageID.113, 115).  Plaintiff timely requested an administrative hearing, which was held before the ALJ on June 2, 2021.  (*Id.*, PageID.54).  Plaintiff testified by video at the hearing, as did a vocational expert (VE).  (*Id.*, PageID.54-90).  Plaintiff offered the following testimony.

Plaintiff lived in a house with his wife, three children (a six-year-old daughter, a twelve-year-old son, and a twenty-one-year-old son), and his older

son's girlfriend. (*Id.*, PageID.59-60). Plaintiff's bedroom was on the main floor. (*Id.*, PageID.61). He completed high school and previously held a CDL A. (*Id.*, PageID.61-62).

Plaintiff weighed 397 pounds, and his weight affected his ability to do normal activities. (*Id.*, PageID.69-70). One of plaintiff's doctors recommended bariatric surgery, but plaintiff's insurance would not cover the procedure. (*Id.*, PageID.70).

Plaintiff had a total left knee replacement in October 2012. (*Id.*, PageID.74). In December 2018, following a workplace injury, Plaintiff's knee had to be replaced again. (*Id.*). Due to the damage caused in 2018, Plaintiff's left leg was now an inch and a half longer than his right leg. (*Id.*). He continued to struggle with swelling in his left knee. (*Id.*). Plaintiff used a walker for ambulation when his back hurt. (*Id.*, PageID.74-75).

At the time of the hearing, the recommendation for Plaintiff's back problems was to do a triple epidural every six months. (*Id.*). He had also recently started taking Gabapentin to help him regain feeling in his feet, specifically in his big toes. (*Id.*, PageID.70, 72). Plaintiff was diagnosed with sleep apnea and used a CPAP machine every night. (*Id.*, PageID.73). He had a hard time breathing through the mask due to his allergies. (*Id.*). It was recommended that he order a different type of facemask, but his insurance would not cover it. (*Id.*, PageID.73-74). Plaintiff

3

did not sleep well at night and frequently got in and out of bed.  (*Id.*, PageID.79).

Plaintiff was able to do some chores and take care of all of his own personal hygiene without any assistance.  (*Id.*, PageID.75-76).  He used a riding lawnmower to mow part of his lawn, but sometimes had to take breaks due to back pain.  (*Id.*).  He could typically use the lawnmower for twenty-five to forty-five minutes at a time.  (*Id.*, PageID.76).  Plaintiff usually cooked dinner three or four nights each week and was able to handwash dishes by taking a midway break.  (*Id.*).  Plaintiff spent on average two to four hours resting while lying down during a day.  (*Id.*, PageID.78).

On June 11, 2021, the ALJ issued a written decision finding that Plaintiff was not disabled.  (*Id.*, PageID.38-53).  On August 19, 2022, the Appeals Council denied Plaintiff's request for review, (*id.*, PageID.26-30), making the ALJ's decision the final decision of the Commissioner.  Plaintiff timely filed for judicial review of the final decision.  (ECF No. 1).

B.    Medical Evidence[2]

1.    Orthopedic Records

On October 25, 2018, Plaintiff presented to Gerald Jerry, M.D. (Dr. Jerry)

---

[2] Medical records predating Plaintiff's alleged onset date of October 10, 2018, will not be summarized.  *See, e.g.*, *Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 716 n.8 (S.D. Ohio 2012) ("In determining whether a Plaintiff is 'disabled,' the ALJ generally only considers evidence from the alleged disability onset date through the date last insured.").

following a workplace accident the previous month where he stepped in a hole and twisted his left knee, which had previously been totally replaced. (ECF No. 8, PageID.327). His knee rapidly swelled, and he was treated for swelling with a Medrol dose pack. (*Id.*). X-rays showed that Plaintiff's left knee replacement was still intact, well-positioned, and well-aligned. (*Id.*, PageID.328). His knee was aspirated, a brace was prescribed, and a revision surgery was scheduled. (*Id.*).

Plaintiff's revision surgery occurred on December 10, 2018. (*Id.*, PageID.334). His pre and postoperative diagnosis was as follows: "Failure of left total knee arthroplasty done elsewhere with secondary development of injury pattern, twisting knee at work, stepping into a hole rapid onset and ligament complex disruption PCL, MCL and LCL collateral structures with secondary gross instability of left total knee arthroplasty, recurrent effusions." (*Id.*). The surgery was free of complications and tolerated "very well" by Plaintiff. (*Id.*, PageID.336).

On January 2, 2019, Plaintiff returned to Dr. Jerry for his postoperative visit. (*Id.*, PageID.330). The revision procedure was necessary because of "secondary disruption of ligament." (*Id.*). Dr. Jerry recommended that Plaintiff switch to a more sedentary job, prescribed a knee brace for stability, and recommended physical therapy to improve mobilization, strengthening, and stretching. (*Id.*, PageID.331).

At a March 13, 2019 appointment with Dr. Jerry, Plaintiff complained of "a

pinching sensation across patella when standing after sitting for a period of time."
(*Id.*, PageID.332). On physical examination, Plaintiff's left knee showed a motion
pattern from 0-130 degrees, stable collateral structures, left patella that "track[ed]
essentially anatomically," and no swelling. (*Id.*, PageID.332-333). It was noted
that he had "[l]umbar referred pain secondary to multilevel degenerative disc
disease causing L5 burning pain." (*Id.*, PageID.333). Dr. Jerry concluded that
Plaintiff was "doing very well," and did not need to return for a follow-up visit for
a couple of years. (*Id.*). He also indicated that Plaintiff would be sent to "a
training program at Michigan Works for job alternative as he need[ed] a more sit
down job." (*Id.*).

### 2. Primary Care Records

#### a. Family Medicine[3]

October 11, 2018 – Since his last visit, Plaintiff's swelling had not gone
down, and he had experienced a second episode of syncope. He still had a few
steroid pills remaining from his prescribed course. His visit assessments included
severe lumbar stenosis and arthritis in both knees. He was prescribed Norco and
instructed to consult with Dr. Jerry. (ECF No. 8, PageID.360).

December 6, 2018 – Plaintiff was evaluated for knee swelling and knee and
back pain. His visit assessments included severe lumbar stenosis and arthritis in

---

[3] These records are primarily handwritten and difficult to read.

both knees.  He was prescribed Norco.  (*Id.*, PageID.355).

January 10, 2019 – Plaintiff presented for knee and back pain.  He was doing physical therapy and using a walker for balance.  His visit assessments included severe lumbar stenosis and arthritis in both knees.  (*Id.*, PageID.352).

February 7, 2019 – Plaintiff reported that he fell down the stairs a few days prior and hurt his left knee.  He was icing his knee.  Plaintiff reported that doing stretches at home was going well as he could not afford physical therapy.  His visit assessments included severe lumbar stenosis and arthritis in both knees.  Plaintiff was directed to continue eating a healthy diet and doing knee exercises as well as using a walker if needed.  (*Id.*, PageID.350).

March 5, 2019 – Plaintiff complained of feeling a sensation of water running down his left leg.  He also reported that he could not afford physical therapy and was instead doing stretches and exercises at home.  (*Id.*, PageID.348).

April 8, 2019 – Plaintiff reported that his left knee and lumbar pain was "well controlled."  His blood pressure was also well controlled.  It was noted that Plaintiff would need to see a pain management specialist in the future.  (*Id.*, PageID.349).

b.   Philip Matich, M.D. (Dr. Matich)

On May 2, 2019, Plaintiff presented to Dr. Matich to establish care.  (ECF No. 8, PageID.572).  Plaintiff reported that he had recently fallen in Kroger "due to

7

a bad knee." (*Id.*). He also reported on and off tingling "down his left leg" as well as "some back pain when standing for longer periods of time." (*Id.*). Dr. Matich continued Plaintiff's Norco prescription. (*Id.*, PageID.574).

Between June 6, 2019 and November 19, 2019, Plaintiff had monthly appointments with Dr. Matich to have his Norco prescription renewed. Norco was being used to manage the pain caused by Plaintiff's degenerative disc disease. (*Id.*, PageID.546-571).

December 17, 2019 – Plaintiff complained of "[l]eft knee instability with severe pain for one week." (*Id.*, PageID.540). He "[w]as using a walker daily until pain reduced." (*Id.*). Plaintiff reported that he was unable to exercise to lose weight because of his multiple comorbidities. (*Id.*). Dr. Matich refilled his Norco prescription. (*Id.*, PageID.542).

January 14, 2020 – Plaintiff presented to follow up on "severe low back pain" that "continue[d] to radiate into his legs." (*Id.*, PageID.537). He was able to complete activities of daily living with the help of Norco which partially relieved his pain. (*Id.*). His insurance company continued to deny an authorization for bariatric surgery. (*Id.*). Dr. Matich refilled Plaintiff's Norco prescription. (*Id.*, PageID.539).

February 11, 2020 – Plaintiff complained of persisting low back pain "with new onset of bilateral leg spasms and shooting pains into feet" that were keeping

him up at night. (*Id.*, PageID.533). Norco managed but did not completely relieve

his pain. (*Id.*). Plaintiff had lost eight pounds since starting a plant-based diet.

(*Id.*). Dr. Matich continued Plaintiff on Norco for his degenerative disc disease

and started him on Soma for lumbar radiculopathy. (*Id.*, PageID.535).

Between June 9, 2020 and November 24, 2020, Plaintiff visited with Dr.

Matich monthly in order to obtain Norco refills. The notes for these appointments

are the same or similar as those for earlier appointments. (*Id.*, PageID.612-622).

On November 9, 2020, Plaintiff underwent an MRI of his lumbar spine.

(*Id.*, PageID.639). The impressions were as follows:

1.      Multilevel degenerative disc disease.

2.      At T12-L1 there is a small focal right paracentral disc herniation
        with mild effacement of thecal sac but no canal stenosis or
        foraminal encroachment.

3.      Broad-based disc herniations L3-4 and L2-3 with broad-based
        disc bulging at L4-L5 resulting in foraminal encroachment as
        discussed above. Canal stenosis at L3-L4 noted.

(*Id.*).

On February 26, 2021, Plaintiff presented to Karey Hartford, DNP, FNP-C

(NP Hartford) to establish care following Dr. Matich's retirement. (*Id.*,

PageID.609-611). NP Hartford continued Plaintiff on Norco and Soma and

planned to review his MRI results. (*Id.*, PageID.610). She instructed Plaintiff to

follow up in three months. (*Id.*).

9

### 3. Sleep Apnea

On September 5, 2019, Plaintiff presented to Syed V. Ali, M.D., P.C. (Dr. Ali) for a sleep apnea consultation. (ECF No. 8, PageID.511). Dr. Ali recommended that Plaintiff lose weight, exercise, and practice adequate sleep hygiene. (*Id.*, PageID.514). He also educated Plaintiff about the dangers of untreated sleep apnea and instructed him to use always use a CPAP when sleeping. (*Id.*). On September 10, 2019, Plaintiff underwent a polysomnogram (sleep study), which revealed severe sleep apnea as well as severe snoring. (*Id.*, PageID.528).

At his October 1, 2019 follow-up appointment, Plaintiff reported unchanged symptoms to Dr. Ali. (*Id.*, PageID.516). Plaintiff was unable to undergo a CPAP titration study because his insurance would not cover it. (*Id.*). On November 25, 2019, Plaintiff returned to Dr. Ali and reported improved symptoms, including improved daytime alertness and concentration. (*Id.*, PageID.520). On December 7, 2020, Plaintiff presented to Dr. Ali and did not appear to raise any specific concerns. (*Id.*, PageID.579). His CPAP compliance was 100%. (*Id.*).

### 4. Medical Opinions

On July 19, 2019, Plaintiff was evaluated by Suezette Olaker, M.D. (Dr. Olaker) at the request of the Social Security Administration (SSA). (ECF No. 8, PageID.503-505). Plaintiff's chief complaints were knee replacement, degenerative disc disease, asthma, and high blood pressure. (*Id.*, PageID.503). His

10

current medications were Losartan, Hydrocodone, and Ventolin.  (*Id.*,

PageID.504).  Dr. Olaker made the following impressions:

1. Status post second left knee replacement with surgeons refusing to allow [Plaintiff] to return to regular work or heavy physical work.

2. Degenerative discs in the back.

3. Asthma – on medications.  [M]ild.

4. High blood pressure – on medications.

5. Obesity.  [Plaintiff] reports having gained approximately 60-70 pounds since his last surgery, although he does plan to lose weight and considering evaluation for bariatric surgery sometime in the future.

(*Id.*, PageID.505).  Her medical source statement was as follows: "Based on

[Plaintiff's] history as well as today's evaluation and in consideration of his age,

heavy work demands, weight and history of two knee replacements, his physical

limitations are consistent with [his] statements which continue heavy work

demands." (*Id.*).  Regarding Plaintiff's functional limitations, Dr. Olaker opined as

follows: "[Plaintiff] is able to perform in all areas.  He is able to carry, push and

pull approximately five pounds.  He avoids stair climbing completely as he fell on

descending stairs approximately three months ago post operatively." (*Id.*).

On August 6, 2019, Trinh Nguyen, D.O. (Dr. Nguyen) provided the medical

findings supporting the denial of Plaintiff's applications.  (*Id.*, PageID.95-99).  Dr.

Nguyen opined that Plaintiff was limited to sedentary work but with the less

11

restrictive lifting/carrying requirements associated with light work; could never climb ladders, ropes, or scaffolds; could occasionally perform other postural activities; and should avoid temperature extremes, wetness, humidity, vibration, pulmonary irritants, and hazards. (*Id.*, PageID.95-98). He further opined that Plaintiff could sit for about six hours and stand and/or walk for about two hours out of an eight-hour workday. (*Id.*, PageID.97).

On September 3, 2020, Dr. Matich wrote a letter opining that Plaintiff was "not capable of eight hours of basic work activities." (*Id.*, PageID.577). Dr. Matich noted that Plaintiff had "severe pain and swelling of the left knee" as well as "severe lumbar degenerative disc disease with bilateral radiculopathy and leg weakness." (*Id.*). While Plaintiff experienced relief from knee and some back pain while sitting, his lumbar pain continued. (*Id.*).

Plaintiff had also "developed pain in [his] quads and hamstrings" and on examination was "having much difficulty in rising pain in lumbar spine and down legs along with weakness in legs, which only allows him to stand for 10-15 minutes at a time." (*Id.*). Due to pain, Plaintiff had major instability in his left knee and was "unable to walk and maintain weight especially on his left knee." (*Id.*). Additionally, Plaintiff's morbid obesity "worsen[ed] his back and knee problems." (*Id.*, PageID.577-578).

III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

13

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff was not disabled under the Act. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 10, 2018. (ECF No. 8, PageID.43). At Step Two, the ALJ found that he had the severe impairments of degenerative disc disease of the lumbar spine, status-post total left knee replacement, obstructive sleep apnea, asthma, and morbid obesity. (*Id.*). At Step Three, the ALJ found that none of Plaintiff's impairments met or medically equaled a listed impairment. (*Id.*, PageID.44).

The ALJ then assessed Plaintiff's residual functional capacity (RFC), concluding that he was capable of performing sedentary work except he

> would be limited to never climbing ladders, ropes, or scaffolds and
> occasionally performing the remaining postural activities.  [Plaintiff]
> would require the ability to alternate between standing for 2-3 minutes
> after 30 minutes of sitting if needed.  He would be limited to no more
> than occasional concentrated exposure to extreme heat/cold, wetness,
> humidity, vibration, atmospheric conditions, unprotected heights, and
> dangerous moving machinery.

(*Id.*, PageID.45).

At Step Four, the ALJ found that Plaintiff was unable to perform any past relevant work.  (*Id.*, PageID.47).  At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Plaintiff was capable of performing the jobs of office clerk (57,000 jobs nationally), sorter (22,000), and food and beverage order clerk (16,000).  (*Id.*, PageID.48-49).  As a result, the ALJ concluded that Plaintiff was not disabled under the Act.  (*Id.*, PageID.49).

IV.   Standard of Review

A district court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although a court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

15

F. App'x 220, 224-225 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence." 42 U.S.C. § 405(g). The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) (" 'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.' " (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless

16

the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial.
The court must " 'take into account whatever in the record fairly detracts from
[the] weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384,
395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487
(1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this
Court defers to that finding even if there is substantial evidence in the record that
would have supported an opposite conclusion."  *Blakley*, 581 F.3d at 406 (internal
quotation marks and citation omitted).  Finally, even if the ALJ's decision meets
the substantial evidence standard, "a decision of the Commissioner will not be
upheld where the [Social Security Administration] fails to follow its own
regulations and where that error prejudices a claimant on the merits or deprives the
claimant of a substantial right."  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,
651 (6th Cir. 2009) (internal quotation marks and citations omitted).

## V.    Analysis

Plaintiff argues that the ALJ erred by failing to consider Listing 1.17 and
when crafting the RFC.  Each of these arguments will be considered below.

### A.    Listing 1.17

#### 1.    Legal Standard

"At the third step in the disability evaluation process, a claimant will be

found disabled if his impairment *meets or equals* one of the listings in the Listing of Impairments." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) (emphasis in original)). "The Listing of Impairments . . . describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.' " *Id.* (quoting 20 C.F.R. § 404.1525(a)). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing' " and "[a] claimant must satisfy all of the criteria to 'meet' the listing." *Id.* (quoting 404.1524(c)(3)). "Ultimately, it is a claimant's burden to demonstrate that his impairments meet or medically equal a relevant listing." *Kirkland v. Kijakazi*, No. 3:22-CV-60-DCP, 2023 WL 3205330, at *4 (E.D. Tenn. May 2, 2023) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)).

"[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.' " *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)). "The ALJ should discuss the relevant listing, however, where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)). "A claimant

18

must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he has satisfied a listing." *Id.*; *see also Sheeks*, 544 F. App'x at 641-42 (finding that the claimant did not raise a substantial question as to satisfying the listing for intellectual disability where the ALJ's finding of borderline intellectual functioning simply left open the question of whether he met a listing and where the claimant pointed to only a few pieces of tenuous evidence addressing the listing). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432. "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433.

## 2.    Application

Plaintiff faults the ALJ for failing to consider Listing 1.17, which concerns reconstructive surgery or surgical arthrodesis of a major weight-bearing joint. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.17. To satisfy Listing 1.17 a claimant must meet the following three requirements:

A.    History of reconstructive surgery or surgical arthrodesis of a major weight-bearing joint.

AND

B.    Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months.

19

> AND
>
> C.   A documented medical need (see 1.00C6a) for a walker, bilateral
>      canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated
>      mobility device involving the use of both hands (see 1.00C6e(i)).

*Id.*  Here, the dispute is whether Plaintiff meets requirement C, specifically

whether there is a substantial question that Plaintiff had a documented medical

need for a walker.  To satisfy requirement C, Plaintiff needs to have presented

> evidence from a medical source that supports [his] medical need for an
> assistive device (see 1.00C2b) for a continuous period of at least 12
> months (see 1.00C6a).  This evidence must describe any limitation(s)
> in [his] upper or lower extremity functioning and the circumstances for
> which [he] needs to use the assistive device.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00C6a.  However, it is not required that

Plaintiff show he had "a specific prescription for the assistive device."  *Id.*

Plaintiff points to a few places in the record in support of his position that he

had a medical need for a walker for a continuous period of at least 12 months, but a

review of the medical records cited does not support his position.  Plaintiff asserts

that Dr. Jerry prescribed him a walker following his knee surgery and cites to Dr.

Jerry's operative report as evidence of this claim.  (ECF No. 12, PageID.664

(citing ECF No. 8, PageID.334-336)).  However, Dr. Jerry's operative report does

not mention a walker nor do any of Dr. Jerry's other records.  *See* ECF No. 8,

PageID.327-333.  Next, he points to two records dated from January and February

2019, that indicate Plaintiff should "use walker if needed," (ECF No. 8,

20

PageID.350), and that Plaintiff self-reported "using walker for balance," (*id.*, PageID.352).  To the extent these records show that Plaintiff had a documented medical need for a walker, they only cover the couple of months immediately following Plaintiff's left knee revision.

Next, Plaintiff points to records suggesting that he suffered from balance problems and altered sensation below the knee as evidence of his continued need for a walker.  (ECF No. 12, PageID.664).  However, these records go to requirement B, which requires a claimant to establish impairment-related physical limitation of musculoskeletal functioning.  The records do not mention a need for a walker and thus do not help Plaintiff meet requirement C.

Finally, Plaintiff relies on his own hearing testimony in support of his need for a walker.  (*Id.*, PageID.664-665).  At the hearing, Plaintiff testified that he used a walker for ambulation when his back hurt.  (ECF No. 8, PageID.74-75).  Listing 1.17 concerns reconstructive surgery of a major weight-bearing joint, meaning that even if Plaintiff needed a walker for ambulation due to his other impairments such as degenerative disc disease, this does not help him establish Listing 1.17. Moreover, as the Commissioner points out, Plaintiff did not indicate in his self-completed function report from June 2019, that he used a walker.  (ECF No. 16, PageID.696 (citing ECF No. 8, PageID.285)).  Instead, Plaintiff only indicated that he used a brace/splint.  (ECF No. 8, PageID.285).  Regardless, Plaintiff needs to

have "present[ed] specific medical evidence to satisfy all of the criteria." *Perschka v. Comm'r of Soc. Sec.*, 411 F. App'x 781, 786 (6th Cir. 2010) (citing 20 C.F.R. § 416.925). His testimony is not specific medical evidence and thus could not have been used to establish that Plaintiff met requirement C.

Ultimately, "[a] substantial question about whether a claimant meets a listing requires more than what [Plaintiff] has put forth here, a mere toehold in the record on an essential element of the listing." *Sheeks*, 544 F. App'x at 643. Accordingly, Plaintiff has failed to raise a substantial question as to whether he met requirement C and Listing 1.17 as a whole, meaning he is not entitled to relief on this argument.

## B. RFC

### 1. Legal Standard

In determining a claimant's RFC, it is necessary to consider (1) objective medical evidence as well as (2) subjective evidence of pain or disability. 20 C.F.R. § 404.1545(a)(1) (providing that the RFC must be based "on all the relevant evidence"). The "RFC is to be an 'assessment of [a claimant's] remaining capacity for work' once [his] limitations have been taken into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). When crafting the RFC, the ALJ must consider the restrictions alleged by the claimant. §§ 404.1545(b-d), 416.945; SSR 96-8p, 1996 WL 374184, at *6 (July 2, 1996).

22

"Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (internal quotation marks and citation omitted). "[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Id.* (internal quotation marks and citation omitted).

### 2.    Application

Plaintiff argues that even though the ALJ restricted him to sedentary work with additional limitations, he still

> failed to include the full picture of limitations caused by [ ] Plaintiff's numerous severe medical conditions: full titanium left knee replacement surgery, degenerative disc disorder, severe lumbar stenosis, C5 bone to bone, asthma, emphysema, chronic obstructive pulmonary disease (COPD), sinus tachycardia, severe obstructive sleep disorder (OSA), high blood pressure (HBP), chronic fatigue syndrome, osteoarthritis, chronic sinusitis, mild depression/anxiety, chronic fatigue and tiredness from all of his medical conditions, daytime sleepiness, and side-effects from his medications.

(ECF No. 12, PageID.656). For instance, Plaintiff faults the ALJ for finding that he could perform sedentary work that would "require[ ] a good amount of sitting, approximately six hours of an 8-hour workday." (*Id.*, PageID.657). But Plaintiff fails to explain how the RFC's additional limitation of "the ability to alternate between standing for 2-3 minutes after 30 minutes of sitting if needed[,]" (ECF No.

8, PageID.45), failed to adequately account for Plaintiff's difficulty sitting for long periods of time.  He similarly fails to explain how his need to wear a knee brace when standing or walking for more than ten minutes would be incompatible with sedentary work.  Plaintiff also does not explain how the ALJ's lack of discussion about his need for an assistive device rises beyond harmless error.  This is because, assuming *arguendo* that Plaintiff has established a need for an assistive device, where a claimant is assessed a sedentary work restriction, an ALJ's failure to take assistive device usage into consideration is harmless error.  *See Johns v. Comm'r of Soc. Sec*, No. 2:20-CV-12271, 2022 WL 454281, at *7 (E.D. Mich. Jan. 26, 2022), *report and recommendation adopted*, 2022 WL 447058 (E.D. Mich. Feb. 14, 2022); *Jozlin v. Comm'r of Soc. Sec.*, No. 12-CV-10999, 2013 WL 951034, at *9 (E.D. Mich. Mar. 12, 2013).

The ALJ found Plaintiff's left knee replacement and degenerative disc disease to be severe impairments and he considered them when crafting the RFC. Following Plaintiff's knee surgery in December 2018, Dr. Jerry wrote that Plaintiff would be sent to "a training program at Michigan Works for job alternative as he need[ed] a more sit down job."  (ECF No. 8, PageID.333).  This is entirely consistent with the ALJ's determination that Plaintiff could work a sedentary job with additional limitations.

Furthermore, even fully crediting Plaintiff's claims that his symptoms

24

continued to worsen up until the hearing date, the medical records and his testimony nonetheless establish that he performed a number of activities of daily living by making relatively minor accommodations for his pain. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726 (6th Cir. 2013) ("[T]he regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled."); SSR 16-3p (providing that ALJs "must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record"). For example, he testified that he could do some chores and take care of all of his own personal hygiene without any assistance. (*Id.*, PageID.75-76). He cooked dinner for his family around four nights a week and could perform chores including mowing the lawn and handwashing dishes if he incorporated breaks. (*Id.*, PageID.76, 78).

Plaintiff also suggests that the ALJ failed to properly consider that his "lack of insurance coverage for needed medical care has held him back from seeing specialists for his back, undergoing physical therapy, getting an upgraded mask for his C-PAP machine, as well as seeing specialists for heart and lung testing and treatment," arguing that "the ALJ saw fit to view this evidence as proof that he was not that limited by his medical conditions, rather than evaluating the medical record and other evidence, and reconciling the truth regarding his treatment."

(ECF No. 12, PageID.559-560).  Plaintiff appears to be referring to the section of
the ALJ's opinion evaluating the credibility of Plaintiff's testimony.  The ALJ
wrote:

> [Plaintiff's] back pain was treated conservatively with medication and
> epidural steroid injections every 6 months.  In February 2020,
> [Plaintiff] reported his medication allowed him to perform activities of
> daily living and could complete routine household chores with
> managed but not complete pain relief.  At the June 2021 hearing,
> [Plaintiff] reported he has not treated with a TENS unit or physical
> therapy for back pain.

(ECF No. 8, PageID.46 (internal record citations omitted)).

The ALJ's evaluation is supported by the record.  At his medication review
appointments with Dr. Matich, Plaintiff frequently reported that while not
completely relieving his back pain, Norco allowed him to perform activities of
daily living including household chores.  *See, e.g., id.*, PageID.533, 537, 612-622.
The ALJ thus properly considered the effects of Plaintiff's medications on his
symptoms.  *See Smith v. Comm'r of Soc. Sec. Admin.*, 564 F. App'x 758, 763 (6th
Cir. 2014) (noting that "evidence that medical issues can be improved when using
prescribed drugs supports denial of disability benefits") (citing *Hardaway v.
Secretary*, 823 F.2d 922, 927 (6th Cir. 1987)); SSR 16-3p (providing that an ALJ
may consider a "record of any treatment and its success or failure"); *see also Gant
v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010) ("Impairments that
are controllable or amenable to treatment cannot support a finding of disability."

26

(internal citations omitted)).

Furthermore, the ALJ did not hold Plaintiff's inability to afford certain treatments against him. The record establishes that Plaintiff could not obtain insurance coverage for additional physical therapy for his left knee, bariatric surgery, and certain treatments relating to his sleep apnea. (*Id.*, PageID.70, 73-74, 348, 350, 516, 537). There does not appear to be anything in the record regarding Plaintiff's inability to access physical therapy for his back or treatment with a TENS unit. Accordingly, Plaintiff has not established that the ALJ improperly failed to consider his inability to afford physical therapy for his back or treatment with a TENS unit. *See* 20 C.F.R. § 416.945(a)(3) (providing that a claimant is "responsible for providing the evidence . . . use[d] to make a finding about [his] residual functional capacity").

Plaintiff also faults the ALJ for not further discussing his obesity. The ALJ wrote:

> In addition, [Plaintiff] reported [that] he weighs 397 pounds. [Plaintiff's] obesity and body habitus were considered and factored into the exertional and nonexertional limitations as set forth in the residual functional capacity in accordance with SSR 19-2p. Although [Plaintiff's] obesity could reasonably cause some of his alleged secondary back and knee pain, there is no objective evidence his obesity affects [his] ability to ambulate effectively, and his respiratory and cardiovascular functioning are not secondarily impaired. Instead, the objective records routinely note a stable gait with no secondary end-organ damage.

(*Id.*, PageID.47). This discussion of Plaintiff's obesity is more extensive than

27

Plaintiff implies in his brief when he states that "[t]he ALJ merely stated 'there is not objective evidence his obesity affects [Plaintiff's] ability to ambulate effectively.'" (ECF No. 12, PageID.662 (quoting ECF No. 8, PageID.47)). Moreover, Plaintiff does not point to evidence contradicting the ALJ's analysis, instead stating that the ALJ's "statement purely defies common knowledge" as "Plaintiff is a 400-pound man with multiple knee surgeries and chronic back pain." (*Id.*). He further states that "[g]iven the severity of his obesity combined with his chronic pain and fatigue, he would clearly have additional, significant limitations that were not accounted for by the ALJ." (*Id.*). Plaintiff, however, does not explain what these additional limitations are or how they differ from the limitations already assessed by the ALJ. "[D]isability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it." *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (citing *Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988)). As such, Plaintiff cannot state that he is obese and appeal to common sense in order to establish disability; he must do something more, such as indicate the corresponding functional limitations and cite the record support for these limitations.

Plaintiff also disagrees with the ALJ's evaluation of the medical opinions, stating that "[r]ather than focus on the preponderance of evidence supporting the treating providers' opinions, the ALJ dismisses both in an ill-placed fashion

without any support, made in such a way that attempts to insert himself as a medical professional which is indeed improper." (*Id.*, PageID.661). Contrary to Plaintiff's argument, the ALJ properly evaluated the medical opinions of record under current regulations.

When evaluating a medical opinion, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." 20 C.F.R. § 404.1520c(b). The ALJ evaluates the persuasiveness of the medical opinions and prior administrative medical findings by utilizing the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. § 404.1520c(c). Supportability and consistency are the most important factors and the ALJ must explain how he considered these factors in his decision. § 404.1520c(b)(2).

The ALJ evaluated the three medical opinions of record as follows:

Dr. Olaker

> The undersigned does not find Dr. Olaker's assessment is persuasive because the limitations were unsupported by the medical evidence relied upon, including [Plaintiff's] presentation with full motor strength and stable gait during the clinical exam. The limitations were also inconsistent with the medical evidence, including the full extremity motor strength and intact sensation during treatment.

(ECF No. 8, PageID.46-47 (internal record citations omitted)).

Dr. Nguyen

> The undersigned finds [Dr. Nguyen's] assessment is persuasive in terms of [his] recommendation for sedentary work with postural and environmental limitations because the restrictions were supported by the medical evidence relied upon, including [Plaintiff's] presentation with limited lumbar range of motion at times during treatment. The limitations were also consistent with the medical evidence, including [Plaintiff's] reports of knee pain and swelling following his procedures. However, based on the medical evidence and [Plaintiff's] testimony regarding his continuing ongoing knee and back pain, the undersigned finds [Plaintiff] would be further limited to sedentary lifting with requiring the ability to alternate between standing for 2-3 minutes after 30 minutes of sitting if needed.

(*Id.*, PageID.47).

Dr. Matich

> The undersigned does not find Dr. Matich's assessment is persuasive because the limitation was inconsistent with the medical evidence, including [Plaintiff's] presentation with normal musculoskeletal exam findings as recently as February 2021. In addition, Dr. Matich's limitation was not supported by the specific objective medical evidence relied upon.

(*Id.*, PageID.46 (internal record citation omitted)).

As outlined above, the ALJ focused on the factors of supportability and consistency when evaluating the medical opinions. (ECF No. 8, PageID.46-47). He specifically considered whether the opinions were consistent with other record evidence and supported by objective findings. Even if the Court were to disagree with the ALJ's conclusions, the conclusions would nonetheless be upheld as supported by substantial evidence.

Finally, to the extent that Plaintiff argues that the ALJ erred by failing to address certain discrete pieces of evidence, this argument does not carry the day. This is because the ALJ was not required to directly address every piece of evidence to show his consideration of it. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Furthermore, the ALJ cannot be faulted for not giving more consideration to Plaintiff's lumbar MRI because there are no medical records or provider opinions explaining what the MRI means in terms of Plaintiff's functional limitations. *See Flowers v. Comm'r of Soc. Sec.*, No. 14-CV12449, 2015 WL 4274961, at *4 (E.D. Mich. July 14, 2015) ("[T]he MRI and the CT scan reports provide no insight into what additional limitations Plaintiff may suffer from based on the diagnoses therein."). The ALJ is not a doctor and is unable to assess functional limitations based merely upon MRI findings.

In sum, Plaintiff has failed to establish that the ALJ erred when assessing the RFC.

## VI.    Conclusion

In the end, the record establishes that Plaintiff suffers from some degree of impairment due to pain in his left knee and back which affects his daily life. However, because the ALJ's determination was within the "zone of choice" accorded to the factfinder at the administrative hearing level, it cannot be disturbed by this Court. *Blakley, supra*, 581 F.3d at 406. Accordingly, for the reasons stated

above, Plaintiff's motion, (ECF No. 12), is DENIED; the Commissioner's motion,

(ECF No. 16), is GRANTED; and the decision of the ALJ is AFFIRMED.

     SO ORDERED.

Dated: March 26, 2024          s/Kimberly G. Altman
Detroit, Michigan              KIMBERLY G. ALTMAN
                          United States Magistrate Judge

## CERTIFICATE OF SERVICE

     The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 26, 2024.

                          s/Carolyn Ciesla
                          CAROLYN CIESLA
                          Case Manager